I do have a question to ask of both of you. At some point during your argument, I appreciate your answering it. We have a case in the court, O.S. v. Van Alstyne, which you both may be familiar. And my question is whether that case, which of course was submitted before now, raises similar enough Santos issues to warrant this panel deferring submission to see what Van Alstyne has to say. That said, please proceed. Good morning, Your Honors. Jim Vorovyev on behalf of Appellant Steven Ferguson. And actually, I'd like to jump in and answer Judge Reimer's question because I actually filed a supplemental notice of related cases regarding the Van Alstyne matter. My understanding from speaking to counsel for Mr. Van Alstyne and reviewing those briefs is that the issue is, the same issue is involved. And in fact, I believe that the specified unlawful activity is exactly the same, which is mail fraud. So I think based on the Nice Circuit General Order, and I apologize, I don't remember the number, I think deferring submission or some kind of coordination between this panel and the Van Alstyne panel may be warranted. I think it's ultimately the court's prerogative, but that's all I will say on that. Can I ask you also a housekeeping question? Yes, Your Honor. The counts 15 and 16 are the same, 18 U.S.C. 1957. Yes, Your Honor. Looks like your brief, you're only challenging count 15 and not 16. Is that correct? Yes, Your Honor. Why is that? Because count 16 was a transaction involving buying a car for Mr. Ferguson's daughter. And my position, although, I mean, I didn't go into. It's not a business expense? Yeah. Whatever the line the court is ultimately going to draw, I would suspect that buying a car for a daughter, it would be pretty difficult to say that that's. Okay. I'd like to talk about the Santos issue. Santos holds, the Santos plurality, as narrowed by Justice Stevens' concurring opinion, proceeds mean profits so long as there is no legislative history to the contrary. That, I believe, is what the relevant holding of Santos is. And I think to the extent that the issue has been considered in other circuits, which I think is the third circuit in the United States versus Yusuf. I wonder if that's a little broad, a little overbroad as a reading of Santos. In Santos, I guess the particular lottery was illegal because it didn't have a permit. But there wasn't any general prohibition. Lotteries generally were not necessarily criminal conduct. You could get a permit. So really the crime was not having a permit rather than engaging in lottery activity. It's not like a mallum in se. What I'm thinking is the money paid to the grocery stores that sold the tickets and to the winners, it was all honest money, and it was all for the lottery conducted. Here, the money is not honest money. It's not legitimate overhead. It's money to facilitate crime. And what's more, and I think this may really distinguish Santos, it's money for future crime. In this case, putting up all that front and the private jets and the limousines and all that stuff, it's to inveigle future investors to give Ferguson their money. It's not just to pay overhead connected with the past investors who've already been deprived of their money. And I wonder if that doesn't distinguish Santos, no matter what the reading of Santos is. Your Honor, to answer that question, I don't believe either the plurality by Justice Scalia nor concurrence by Justice Stevens nor a fact to dissent by Justice Alito turns in any possible way, shape, or form on whether the crime was mallum in se or mallum prohibitum or on whether the money, as Your Honor described, was honest or dishonest. I think the Court looked at it, for lack of a better term, as strictly an economic proposition. What are the business expense of the activity as pled by the government in the case? And that's all the Court in Santos has done, and I've reviewed, I would say, all the cases. I think that's, as far as it goes, Santos can be read that way. However, what about the next step? Suppose I commit a crime in January to build a war chest so that I can get everything I need to commit a much bigger and better crime in February. It seems to me that the money that I use from the January crime to commit the February crime is not protected by Santos from the money laundering statute. Actually, as Your Honor described, for that general proposition, I don't necessarily disagree. I think if you have distinct separate crimes, let's say you have a — let's take the mail, for example, because this is what we're dealing with. Let's say you have a — the government says there is a Scheme 1 from day 1 to day 100. And then the government also says and proves there was a Scheme 2 from day 101 to day 150. Then you can at least try to — you can argue that the profits or the money that you got in Scheme 1, even if you paid the expense in Scheme 2, that's — I mean, you can at least try to characterize it as a capital investment, at least for some expenses. You know, I won't get into — I must confess, Santos is too mystical for me to figure out, okay? I don't think Santos says anything at all that changes the law of the circuit. It just doesn't have any law except for what it held in that case. So if you put Santos aside and forget being mystical, this thing was a Ponzi scheme, period. There was no business. There was no business enterprise like the lottery, which just lacked a permit. This was a Ponzi scheme. It took in over $5 million. He gave back to his investors a little over $800,000. That leaves well north of $4 million, surely not all of which even you could justify as a necessary transaction to the maintenance of the Ponzi scheme. So he had $4 million worth of profit to play with. And so I just don't get how the couple hundred dollars spent on Devo limousine and the $800 spent on the fish tank could possibly not be coming out of the pool, which was his profit. Let me answer Your Honor's question, then I want to go back to what the Court said about Santos. To answer your question, I think you can't look at profitability in the abstract in this case. In what? I'm sorry. Profitability. You can't just look at profitability of a scheme as divorced from the specific transactions at issue. Okay. Because what you're required to do in order to prove up money laundering, you have to show that the transaction you're talking about was made with profits. And you can't just say, well, the scheme was profitable at some abstract point in time. That must mean that this transaction was made with profit. First of all, I think you have to have the connection between the profit and the transaction, and the burden is on the government to show that connection. Number two, I think — Why hasn't he shown it by putting on the two facts I mentioned? He took in more than $5 million. He gave back about $800,000. And even if you have some just basic ordinary expenses, like, you know, FedEx costs or costs of postage or whatever, you can't conceivably get it up to $4 million. Your Honor, I think, again, I think the Court is looking at it too generally. I think you have to show — no, I apologize. I don't mean to be a pejorative. That's why I'm asking you. Also, just to jump a little bit ahead, to talk about profitability, I think you're sort of begging the ultimate question. Because if something is an expense, then by definition, and I think Santos makes this point clear, at least the plurality does, if it's expense, then by definition it's not profit. And I think that's why I said that you can't just looking — you cannot be looking simply at profitability as an abstract question. And I know that what the government has asked in its brief, that's what the government is asking the Court to do. But I think, ultimately, your resolution of the question of whether these transactions are expenses determines whether or not it was profit. Because if it's expense, it's an expense. You know, under any reasonable accounting system, it cannot be considered profit. Well, so the fish tank was an essential transaction to running the Ponzi scheme. As pled in this particular case. Yes. Now, I'm not saying that — Related to it. Of course. The government's theory was that the fish tank and the trips to Hawaii and the limos and the chef and the this and the that and the other thing were all part of the scheme to show that his lifestyle should have inspired confidence in people such that they would give him their money for nothing. Well, I think the government said a little more than that. I think their pitch was that this was all part of the scheme. This is how the scheme ran. Sure. Also, if you go beyond what the government has alleged and argued, just look what the investors testified. But on your theory, am I right that there is no way that you could ever have a money laundering charge stand up in a Ponzi scheme? No, I don't think that's true at all. Okay. Well, how would you? Well, again — When you've got a lifestyle Ponzi scheme, I mean, I had to spend all this money to look like I'm the world's most affluent, most successful entrepreneur. Then, of course, everything you spend, maybe save for a peanut butter and jelly sandwich occasionally, is designed to further that image, isn't it? Well, I think as you get away to — I think your Honor is describing abstract spending. I'm talking about the specific transaction in this case. Surely, if I was talking about closing personal gifts — in fact, I think we've made it pretty clear that we're not challenging the account where the transaction is purely — I think it's a gift. I'm not saying that you can never have transactions in a Ponzi scheme that couldn't form a basis for a money laundering account. But here, you do not have to go that far. You've got transactions here that, if you ever looked at this as an investment business, all of this would be classic business expense. I mean, I know it's kind of — conceptually, it's hard because, you know, he's taking money from people. I don't disagree that it's sort of — it's hard to kind of put a different hand and let's assume it's a legitimate business. But that's what Santos says we should do. And if you look at it from that point of view, and all the transactions at issue here are normal business expenses. Closing cars, gifts, I think that's a question for another day. And again, had this been closing cars, I think I would have a hard time arguing with a straight face that — again, in abstract, if you talk about a fish tank, and that's, I think, how the government characterized it, you know, a fish tank must be a luxury. In some schemes, it may be a luxury. In some schemes, meals may be a luxury. If a guy runs a one-person operation, which is a hypothetical that Mr. Cazares gives in his brief, and then goes out and has meals, maybe that even a meal would be a personal thing. This particular scheme, how the government alleged and proved up — in fact, I think they argued quite strenuously that this is all part of the show. Also, I would respectfully direct the court to the investor's testimony. Let's forget about what the government has said. Just look at how they describe what made them invest with this particular person. As astounding as it was to me to read that, you know, a Swiss banker would base an investment decision based on that, apparently some of these folks made it known in court that the reason they invested was because he projected a successful image, he had a Beverly Hills office, and two of them specifically mentioned a fish tank. And I gave sites for that testimony in pages 22 to 25 of the reply brief, so the court can take a look at that. So just to summarize my point, once you — if the court agrees with that, that the holding of Santos is what I described it to be. I get lost in Santos. I can't understand the holding. It seems to me that while I read the statute, and it says that the crime is engaging in a monetary transaction with criminally deprived property, which is property constituting or derived from proceeds obtained from criminal offense, it's not clear to me why that doesn't amount to overhead. It also isn't clear to me why money laundering doesn't just mean punishing people twice for committing a crime once. I don't know. I find the whole thing a little mystifying. And it seems to me that where we're led by this analysis of Santos is turning it into kind of an income tax case where we decide whether it's an ordinary and necessary business expense or an essential business expense. It makes no sense to me. I'm frankly lost. Maybe you could give me some coherent explanation of what you think Santos means and what the statute means after Santos. Okay. As far as what I think, and I have to confess, I read it multiple times, and I think I've had different reads from day one to day two. Well, they don't give us a lot of help when they do plurality decisions. It's not the clearest of opinions. For one of the reasons, just the area of the law is not very clear. Just putting everything else aside, this is not the easiest area of the law to digest. I would also point out that several circuit courts did not have trouble ultimately figuring out what Santos holds. And I think it holds that proceeds means profits so long as there is no legislative history to the contrary. And if you look at Justice Alito's dissent, he does mention organized crime and the crime of distributing drugs as two of the crimes. So you think Scalia decided to make the meaning of the statute depend on the legislative history? No. Actually, I believe Stevens did. I think Scalia would always interpret the statute to mean proceeds means profits. And, of course, Justice Stevens, to some extent, accepts that proposal when there is no legislative history to the contrary. And that's why I'd like to come back to Judge Reimer's characterization of Santos. It's difficult, but it's not so divided that you cannot understand what it holds. I think that doctrine precludes the case from becoming sort of the law of the nation if the concurring opinion is not a logical subset of the plurality. Here, plurality basically invokes the rule of leniency and says, you know, we can't really tell from the legislative history and the dictionary what it means, and a tie goes to the defendant. And Stevens says, okay, if there is no legislative history to the contrary. So I think Stevens's concurrence is a logical subset of that opinion. Does it make it a clear opinion overall? Surely. I mean, I'm not going to stand here and tell you that it's clear as day what it means. But that does not mean that the court can just say, well, then we can't decide what it means. You can only do it if the opinion, the rationales were vastly different. And I think the case, the Supreme Court case, was that doctrines involved a situation where the rationales of the concurrence and the plurality were just conflicting with each other. So that's what, that's my understanding of Santos. Did I answer your question? I guess. I'm still confused. Do we get to where somebody says, well, I needed to buy a semi-automatic pistol for the bank robbery, and we say, oh, okay then, that's not money laundering. And I rented a car, and we say, well, you got a Cadillac DTS. You could have gotten a compact car. So that's money laundering. Well, surely it will create some issues in terms of application. I can't, you know, I can't account for all the permutations for which Santos will create. And I think the response to that is to the extent that the government ultimately cannot rely on the statute, the government is the party with the power to have the Congress change the law, because ultimately it's a congressional statute. The government, rather than people like my client, has a political arm to go back and tell the Congress, look, it isn't working, consider changing to something else. But so long as the statute is what it is, so long as the rule of lenity is what it is, you have to do your best to apply Santos, even if it, you know, it probably will create difficult situation depending on an individual case. Let me ask you a question about another matter, a little more familiar territory than this. You have a sentencing claim as well, and I gather the sentencing judge did not specifically make a finding regarding the guideline calculation. Yes, Your Honor. But can't we tease that out from what he did at the end of the transcript where he overruled your objection and adopted the government's position? Well, just for the record, I wasn't her trial counsel, but I don't, and I thought about this for a while, I don't think you can do it from a silent record. I think the question would be closer if the court says I adopt whatever the PSR says. I think that's a closer issue. But if the court says nothing, I mean, it doesn't even talk about the guideline range at all, because I think that portion of the transcript that Your Honor is referring to is talking about the objections to the victim loss and the criminal history points. So, I mean, it impacts it in some way, but you can't really get the precise understanding of what the court determined the range to be based on that ruling. The court never said I'm adopting the ultimate. He didn't say that, but I mean, when you couple the objections with the overruling of the objection, it seems like you can deduce that he was using level 30 at criminal history 3. Well, I think the problem is that the cases beginning with as far back as Booker say that even though the guidelines are advisory, the district court must consult the guidelines. And you cannot take that holding to mean anything other than the court has to tell the parties what that range actually is. And the reason for that is on appeal, as counsel for appellant, I'm facing a pretty high burden. I have to show that the sentence is unreasonable. And if I don't have a record, however minimal it is in terms of explaining the 3553A factors, I have to have some basis, I have to have some record to try to meet my high burden in overcoming a sentence. And if you're going to allow implicit determination to sort of serve as a proxy of what the court calculated the guidelines range to be, you can do this in every case where the court says nothing. Because you have a PSR in every case, right? And then the court could just say nothing. And then by implication it must mean that the court adopted the PSR guidelines calculation. Given the importance that the guidelines still play, even though they're not mandatory, I think the least that the court can do is require the judge to say what the guidelines range is. And of course what makes matters worse is if you couple that with a failure to really explain the 3553A factors. And I realize the court doesn't have to recite them all. It doesn't have to recite most of them. But it has to give me some idea of why the judge reached the sentence that he reached. Well, he said because of what you did. Well, I don't actually, I don't, he doesn't quite say that. But let's assume that he actually expressly said that I'm sentencing because it's not because of what he did. Does that mean the facts of the case? Does that mean his background? Does that mean the combination of the two? I have to have at least some basis to gouge whether a sentence is reasonable. Otherwise I just have to basically argue the null, which is not what the standard of appeal is. And I guess my time is up. I have one more question I need to ask you. On the two conditions of supervised release that are challenged, it appears that there was no objection to them when they were imposed. Is that correct? Yes, that's, as far as it is, that's accurate. As we said in the brief, I think you still have to review it not under the plain error because of the manner in which the conditions were imposed. The first time this issue popped up was at the end of the sentencing hearing where the judge read them. It's not in the PSR. In my understanding, again, I'm, this is more of an anecdotal side. The judge real has a policy of not disclosing the recommendation letter to counsel. So that's another way by which theoretically it could have been disclosed. But my understanding is that it wasn't because my copy of the PSR doesn't have that letter. It's not even discussed in the beginning of the sentencing hearing. All you get is at the very end the judge reads them into the record. And all I'm saying is that it's a due process issue. Maybe there is, there would be an adequate record to impose one or both of them. I don't know. The fact of the matter is if you impose them at the end of the sentencing hearing, as a defense attorney, I don't really have time to formulate any kind of an intelligent objection. I don't have witnesses lined up. I don't have experts. Can't you say I object to your imposing these conditions? Theoretically you could. But if you, I mean, as a practical matter, if you have a long sentencing hearing where your focus may be on the sentence or some other issues, I think it is expecting too much from counsel to basically to come up with this on the fly. And my understanding is that the normal procedure is that something like this would be disclosed to defense ahead of time, and then counsel can decide, well, maybe I don't need to litigate it, maybe I do. But this way we have an ordinary process for imposing the conditions. And the reason I'm saying this is this is why you don't apply the plain error standard, because you apply plain error where basically the defendant did not object and you're essentially faulting the defense for that. I'm not sure that I agree with you. In a case where we talked about this issue, Wise, the judge said this woman was, as I recall, basically pimping out her children. Then she had another one. And the judge imposed a condition of no contact with children, which would mean she loses custody of the new one. And we reversed on that because she didn't have notice of this no contact with children condition. But in that one she did object. Here it was just brand new, out of the blue, wet sentencing. The judge says no contact with children. And her lawyer said, wait a minute. That means her own kids. She won't be able to have contact with her new baby. I suppose some lawyers can persevere even in the worst of circumstances. But, you know, as a matter of a general rule, I think it's expecting too much from a, you know, reasonable counsel standpoint to spring the condition on the defense and expect some kind of an intelligent response. And all we're asking on that issue, send it back to the district court, allow us to make a record. And then we can intelligently decide if it's going to be contested or not. But it shouldn't be imposed in a shotgun manner. That's basically the argument. Thank you.  Thank you. Mr. Farris. Good morning, Your Honors. And may it please the Court, Stephen Kazaris for Appellee United States of America. And let me first address the question with respect to Van Alstyne. It is the government's understanding, as I stand here today, that the appeal there is framed a little differently than it is here, and that the Court there need not necessarily decide the Santos issue. However, rather than stand here and guess for the other reasons why there's a difference here, if the Court would entertain a short letter after the hearing here, the government would be happy to address the issue more directly based on the facts in the Van Alstyne case. We'll let you know if we need it. Thank you. Thank you, Your Honor. Now, to get to the first point with respect to plain error, the government agrees with Judge Kleinfeld and agrees with the defendant that Santos is anything but clear. To the extent that the rule laid down by the plurality opinion in Santos is not clear, given Judge Stephen's discussion in his concurring opinion about whether or not he agrees that it should apply to all SUAs or just limited to the circumstances of the illegal gambling operation, then this Court's standing definition of proceeds in U.S. v. Savage isn't implicated. If there's no clear rule, there can be no plain error that would overturn or at least result in a miscarriage of justice here. And that's essentially the position taken by the Fifth Circuit recently in the Brown decision. There, the Court found that notwithstanding the fact that the elements presented to the jury there were the old gross receipts definition of proceeds, there's no plain error because the rule simply is not clear. It's not clear now that Santos and the rule regarding proceeds is different than this Court's current definition under Savage. Now, with respect to whether or not given that the definition of proceeds as net profits should apply in the mail fraud context, the government has set that out in its brief. The government doesn't believe so that even if net profits applies, at least to the illegal gambling operation and other SUAs, it isn't necessarily applicable in the mail fraud context given the endless variety of schemes that may fall under the mail fraud statute as opposed to the illegal gambling operation, for example, in Santos, as opposed to even a narcotics trafficking situation where you always are going to have some inherent expenses within the course of the scheme. Further, with respect to mail fraud and the elements, obviously just on a basic blockburger analysis, and I recognize that's not what the Court is necessarily dealing with in Santos, but the elements are clearly distinct between 1956 and Section 1341. This Court in U.S. v. Kimbrough has held that the facts necessary to prove up a mail fraud conviction won't necessarily implicate a 1956 charge and prove up a 1956 charge. Certainly there can be some overlap, I think is what the Kimbrough Court said, but they don't always necessarily implicate each other, which is different than what Judge Justice Scalia was arguing about and claiming in Santos. For that reason, and also just based on the nature of the scheme here, this investment fraud scheme, you don't have the same kind of merger issue as you did in the Santos situation. Now, given all that, this Court need not even decide whether or not Santos applies to SUAs beyond the illegal gambling operation for two reasons that have already been addressed somewhat. First, the transactions here at issue, the chef, the limousines, the fish tank, the secretary, personal assistant, and the show office weren't normal in the words of Justice Scalia. I found that a very strange argument when I read your brief. It was like turning it into a tax case, only instead of ordinary and necessary business expenses, we use essential business expenses. Under your analysis in your brief, if the robber buys a gun on credit for the robbery and then he pays his debt immediately after the robbery with the proceeds, that's not money laundering because the gun is essential. But if he rents a getaway car and he gets a Cadillac instead of a Chevy Impala, well, that wasn't essential. He could have made do with an Impala as a getaway car. So that's money laundering when he pays his credit card bill. I cannot imagine that that's the law, because it seems like it wouldn't accomplish any rational purpose that I can attribute to Congress. Well, I guess the distinction here, and it was something I was going to get to, has to do with whether or not an expenditure can constitute promotional activity, yet still not fall under the normal, necessary. As Judge Reimer said, for a Ponzi scheme, the whole idea, the way you con the people, the way the crook cons the people is by putting up a lot of front, looking like to him money is like water because he's earning so much on the imaginary investments, and he has to have a really great-looking office and a great-looking secretary and great-looking limousines and airplanes and meals, and all this stuff is front in order to induce people to have confidence in him and give him their big bucks. I don't have any doubt that it would be ordinary and necessary business expenses for tax purposes. Well, I guess... If he was in a legitimate enterprise, it's like law firms get really nice offices sometimes. Well, the difference is, in this case, what we don't have is a framework of a business operation with some sort of an output that's providing some sort of illegal service or illegal good, as you had in Santos, as you had in the Brown case, or as you had in the Seventh Circuit opinion recently in Lee. In each of those situations, you have a business framework, an illegal business, but a framework nonetheless. The gambling operation, the massage parlor front for prostitution, as well as in Brown, you had this narcotics trafficking involving prescription drugs. Each of those operations in the legal business incurred necessary expenses to continue from day one. If they don't continue to buy drugs, if they don't pay the rent on the massage parlor, and if in Santos you don't pay off the initial bets and winners, the operation ends. It stops right there. Here, however, yes, the government submits and under Savage, these expenses added to the aura of legitimacy of the defendant. And that was the show, as we argued and proved at the trial. But the issue here is each of those promotions that we charge weren't consistent with all of the victims here. Not all of the victims here got limo rides. Not all of the victims here attended dinners where the chef that we charged catered. What does that matter? Pardon me, Your Honor? What does that matter? Why does that matter? Well, the issue then becomes if the expense that promoted the scheme isn't necessarily implicated in every aspect of the scheme and required for it to even continue, then how could it be normal, necessary, or essential? Well, the massage parlor may only have two beds occupied some nights instead of all three. However, I don't actually know what their overhead is. And so the third bed is money laundering? Well, to the extent that the massage parlor is a dual-use facility, I guess, and there's some legitimate massage services provided and there is some criminal operation, prostitution operating out of the same front, the government's position would be you still need the storefront in order to maintain that small element of criminality within that operation. So, yes, the rent is still necessary and is necessary in order to continue the operation from day one. You may have mentioned this already, and if you did, I apologize, on Van Alstine again. Is there a plain error component to that? Actually, Your Honor, I believe that that might be the difference here. I don't believe that plain error may be the standard in that case. And I apologize for not being prepared on that question right now. I can address it, if the Court would like, after the hearing in a short letter. Could you talk about the sentencing issues too, please? Absolutely. Again, as the government set forth in the brief, the government concedes that the record here is not a model record. However, the record is better, significantly better, than the Wachneen case with the same district court. Here, unlike in Wachneen, the Court did set forth on the record that it considered the 3553A factors. Now, it didn't, of course, lay them all each out and discuss them, but did on the record say that the Court considered them in rendering sentence. The Court also, in response to a government prompt, denied defendants' challenges to the PSR calculations, the calculations of the guidelines set forth in the PSR, and adopted the government's responses for why those denials were appropriate. While it may have been a better record and preferable if the Court had set forth on the record that the Court found the guideline calculations to be a level 30 and to be a criminal history level 3, the fact is that the record here at least indicates that the Court considered the calculations, denied defendants' challenges to the calculations in the PSR, and then sentenced defendants, unlike in Wachneen, to a within-guideline sentence actually in the lower half of the guideline, 50 months lower than what the government recommended. So the record here that the government submits is sufficient in order to determine reasonableness, and for each of those reasons the government submits that the sentencing need not go back to the district court for essentially to have the district court lay out on the record that he calculated the guideline calculations in accord with the PSR, because the record reflects that that's what happened. So it's not clear that that small error, to the extent it is error, is sufficient to need to send this back to the district court. With respect to the 1956 challenge, though, I'd like to get back to the government's second point, and that has to do with profitability, because the defense made much of this issue in Santos regarding the unit of offense and how do you calculate profitability in a large scheme like you have here. The government submits that in the context of the federal fraud statutes, mail fraud, wire fraud, bank fraud statutes, this court and bond is held that each individual mailing, wiring, false statement to a bank may be chargeable as separate transactions. However, in the United States v. King and in the United States v. Mastellato, unfortunately I didn't cite those in my brief, but they are on point here. Within one larger charge scheme, you may have multiple iterations, multiple executions of the fraudulent scheme charged as acts in furtherance, which is exactly how this indictment was set out. I need to get you back to sentencing for just a minute. Yes, Your Honor. Could you address for a moment the obstruction of justice enhancement, why that is appropriate? Well, the defendant claims that the obstruction didn't happen within the context of the same investigation. Right, it happened in a different case. It happened in a different case. Here, the investigation of defendant's criminality began with a single FBI agent, Special Agent Parker, who testified at trial, who conducted the full investigation, which led to two actions, the civil forfeiture action and the criminal case that we're here on. The investigation is the same. The victims are the same. The proceeds to the defendant are the same. It is, in fact, all the same case. And, in fact, of course, the co-conspirator victim, if you will, on the obstruction also testified at trial about her role in helping the defendant to conceal his gains from the mail fraud scheme we charged here. And let me ask you to address the notice problem on two of the conditions of supervised release, the prohibition of self-employment and the requirement of participation in a domestic violence program. What we said in Wise is that the notice is important because addressing an issue before the judge has settled on it and trying to talk him into reversing what he's already done are two different problems, and that there has to be notice before a special condition so that the defendant can address it. Well, I guess... Here, the pre-sentence report indicated some need for these, but there was no suggestion in the pre-sentence report of these conditions. It occurs to me with somebody as crooked as Ferguson, it might be hard for him to get a job and it might require some negotiating and tailoring to figure out just what the limitations on his employment ought to be. Well, with respect to the domestic abuse counseling condition, first, here we had a trial. We didn't have a police situation or anything else, and we had significant evidence of the defendant's intimidation and abuse towards women to at least two of the defendants. I'm not saying there wasn't good reason for both of these conditions. They look like really desirable conditions. I'm asking you about notice. Yes, Your Honor. And again, the PSR identified the issue as... I don't remember the PSR giving notice. The PSR didn't specifically recommend, no. Usually that's how you get notice. The PSR recommends the condition. Yes, Your Honor, but the government's position is that this defendant at least has some constructive notice given the indication in the PSR, given the fact that while the guidelines don't call for domestic abuse counseling specifically outside of a domestic abuse case. You're saying he has notice that the conditions may be imposed because if he thought about the particular ways in which he was a bad guy, he would guess that the judge might want to impose them? Well, it is at least conceivable that that notice may be found there. Your Honor, the government doesn't submit that this is a perfect record and perfect notice. But the issue comes down to did the defendant have any notice pre-hearing sufficient to at least object on the record? Your notice is that because at some time he'd beaten his wife, he should know that there's likely to be a notice of domestic violence counseling in his fraud case. It would seem so given the fact that the PSR indicated the issue and the evidence at trial also supported that, that those two facts, combined with the fact that then the judge at the end of the sentencing hearing imposed the condition, the defendant had sufficient notice to at least object at that time. It's not a blank record, for example, in I think the TM case where both of them He'd be objecting after sentence was imposed. Yes, Your Honor. The judge had imposed the condition at the time in the hearing. However, the defendant did not object at that time, even after hearing the court indicate its intent to render the condition, as well as after. Did the judge indicate an intent before he imposed the condition? I thought it was out of the blue. The first words addressed to these two conditions were when the judge imposed them, not an indication of an intent to impose them before he imposed them. The record does not include a specific indication by the court prior to the end of the hearing where the court notified the parties that the court intended to impose that condition. That is accurate, Your Honor. I'm still having trouble with your words. Usually at the end of the sentencing hearing, you don't say what you intend to do. You do it. Well, that's I impose the following sentence upon you, and you do it. And I thought that's the first time the conditions came up. Sometimes earlier in the hearing, the judge says, I intend to impose a condition, and you may address that. And at that point, he hasn't imposed it. And then at the end come the magic words where he pronounces the sentence. Yes, Your Honor. I'm trying to find out when it was first mentioned, and I thought it was when he imposed the sentence. You are correct, Your Honor. But you keep saying intended to impose. Well, no. Are you misspeaking or what? I am misspeaking, Your Honor, and I apologize for that. The court first indicated the imposition of the condition at the end of the hearing. The court did not That's when you impose. You understand that's a judicial act. It's not a statement of intent. Well, the judgment itself hadn't been rendered at that time yet. The law in criminal judgments says if it differs from what the judge said orally when he imposed sentence, what he said orally controls. Yes, Your Honor. I understand that. And I'm not contending that this Court laid a groundwork for the parties to argue in the hearing that the condition should or should not apply. However, nevertheless, the defense did not object at the time that the condition was inappropriate. Got it. And unless the Court has some further questions for the government. Okay. Thank you both for a very helpful argument. The matter just argued will be submitted, and the Court will stand in recess for the day. Thank you.
judges: Rymer, Kleinfeld, Silverman